**IT IS ORDERED as set forth below:**



**Date: August 23, 2023**

_____
**Wendy L. Hagenau**
U.S. Bankruptcy Court Judge

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 12-65475-WLH |
| EMMANUEL OHAI, | CHAPTER 7 |
| Debtor. | |
| EMMANUEL OHAI, | ADVERSARY PROCEEDING NO. 23-5041-WLH |
| Plaintiff, | |
| v. | |
| DELTA COMMUNITY CREDIT UNION, PNC BANK NATIONAL ASSOCIATION, INC., DEAN ENGLE & PARK TREE INVESTMENTS, LLC, PARK TREE 20 INVESTMENTS, LLC, FCI LENDER SERVICES, INC., DANIEL I. SINGER & SINGER LAW GROUP, PHILLIP L. JAUREGUI D/B/A JAUREGUI & LINDSAY LLC, MICHAEL W. LINDSEY D/B/A, JAUREGUI & LINDSEY, LLC, MICROBILT CORPORATION, | |
| Defendants. | |

**ORDER ON DELTA COMMUNITY CREDIT UNION'S MOTION TO DISMISS**

1

This matter is before the Court on the Motion to Dismiss Complaint filed by Delta Community Credit Union ("Delta") (Doc. No. 11), Plaintiff's Response (Doc. No. 13), and Delta's Reply (Doc. No. 20). The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), and the claims of violating the automatic stay and the discharge injunction are core proceedings under 28 U.S.C. § 157(b)(2)(A), (G), & (O). See In re Golden, 630 B.R. 896, 920 (Bankr. E.D.N.Y. 2021) (it is axiomatic that this Court has subject matter jurisdiction to consider such core matters); In re Johnson, 575 F.3d 1079, 1083 (10th Cir. 2009); In re Harlan, 402 B.R. 703, 710 (Bankr. W.D. Va. 2009).

### I.    FACTS

Plaintiff and his now ex-wife purchased their primary residence at 2715 Tradd Court, Snellville, Georgia (the "Tradd Property") in April 2006 and executed a note and security deed in favor of Delta (the "Tradd Mortgage Loan"). In March 2008, Plaintiff and his now ex-wife obtained a home equity loan in the amount of $46,000 from Delta, secured by a second security deed (the "Tradd HELOC"). Plaintiff and his now ex-wife defaulted on the Tradd HELOC in 2010. Delta contacted Plaintiff in September 2011 about a potential modification of the Tradd HELOC. Plaintiff alleges the loan modification was approved, subject to a trial period from November 2011 – February 2012. He alleges Delta sold the loan and/or the servicing rights in early 2012, which prevented him from completing the trial loan modification.

On June 20, 2012, Plaintiff and his now ex-wife filed a petition under Chapter 7 of the Bankruptcy Code. On Schedule D, Delta was listed as holding two secured claims: one for $98,352.00 and another for $39,615.00, both secured by the Tradd Property. The Chapter 7 Trustee, Janet G. Watts, conducted the 341 meeting of creditors on July 17, 2012, and filed a Report of No Distribution on August 16, 2012. The bankruptcy case was closed and discharged on

2

October 5, 2012 (Bankr. Doc. No. 14).[1]

Plaintiff continued to live in the Tradd Property. A foreclosure sale was eventually scheduled for September 3, 2019. Plaintiff applied to Georgia United Credit Union for a mortgage refinance on August 8, 2019 and on August 30, 2019, and also to Delta for a refinancing in October 2019. All were denied (complaint ex 1).

    a.  **District Court Litigation**

On May 26, 2020, Plaintiff filed a complaint in the United States District Court for the Northern District of Georgia, *Ohai v. Delta Community Credit Union et al* Civil Action No. 1:20-cv-02220-SCJ-JEM against Delta and others. Plaintiff alleged violations of several consumer protection statutes (the Fair Credit Reporting Act ("FCRA"), Equal Credit Opportunity Act ("ECOA"), Fair Debt Collection Practices Act ("FDCPA"), Georgia Fair Business Practices Act ("GFBPA")), invasion of privacy, and "defamation—libel". The original complaint did not allege a violation of the automatic stay or discharge injunction. Plaintiff filed an amended complaint (District Court Doc. No. 11) on June 15, 2020. It included claims that Delta violated the ECOA, FCRA, the GFBPA, and the discharge injunction, and engaged in "defamation-libel." The Amended Complaint did not include any claims regarding the automatic stay.

Plaintiff sought to further amend his complaint and filed a Motion for Leave to File the Second Amended Complaint (District Court Doc. No. 108). The court ultimately denied Plaintiff's request to amend the complaint (District Court Doc. No. 149), but the court granted the motion "to the extent that Plaintiff seeks to dismiss his claim for a bankruptcy discharge injunction." Accordingly, the court ruled the First Amended Complaint (District Court Doc. No. 11)—without

---

[1] In the Motion, Delta argues the Court should dismiss the complaint because Plaintiff's bankruptcy case was closed 10 years ago. While reopening is not required, the Court nevertheless entered an order on July 14, 2023 reopening the bankruptcy case, thus mooting the argument about whether the Court should reopen the case.

claim XI regarding the discharge injunction—was the operative complaint (District Court Doc. No. 149 at 45-46.) At this point, then, neither the automatic stay nor the discharge injunction were at issue in the District Court.

Delta filed a motion to dismiss the operative complaint. The District Court dismissed all counts against Delta except for Plaintiff's claim that Delta violated the ECOA when it allegedly denied Plaintiff's application to refinance in October 2019 and allegedly failed to provide requisite notice regarding the application (District Court Doc. No. 236). Accordingly, Count I under the ECOA against Delta remains pending in the District Court.

### b. Adversary Proceeding

On March 29, 2023, Plaintiff filed the complaint against Delta (his former mortgage holder), other mortgage holders, debt collectors, and a consumer reporting agency. The complaint relates to two separate properties, but the actions of Delta only relate to his primary residence at 2715 Tradd Court, Snellville, Georgia (the "Tradd Property"). Much of the complaint against Delta alleges it thwarted Plaintiff's ability to obtain a loan modification of the Tradd HELOC by transferring the loan during the trial period. But these acts occurred prior to the filing of the bankruptcy petition, and therefore prior to the imposition of the automatic stay and the entry of discharge.

The complaint alleges Delta violated the automatic stay because, while the bankruptcy case was pending, Delta sent Plaintiff a letter dated September 14, 2012 in which it stated, "We are suspending your services due to Loan Loss due to Bankruptcy." (Doc. No. 1 ex. H.) The letter explained Delta's policy to suspend services when a loss exists on an account, and informed Plaintiff that his checking account would be closed on October 1, 2012. The letter stated other potential effects of suspension included "closing checking accounts, cancellation of on-line

4

banking, direct deposit, check cashing (including Delta Air Lines paychecks), service center transactions, lines of credit including overdraft protection, convenience loans, home equity and Visa (to include any reward points), as well as being removed as joint owner from other Credit Union accounts." The complaint also claims Delta continued to report payment delinquencies to the credit reporting agencies during the bankruptcy case and "communicated directly" with Plaintiff in an attempt to collect the debt.

Plaintiff asserts that Delta violated the discharge injunction by continuing to attempt to collect discharged debt. He claims that, at some point in 2019, Delta's Loss Mitigation Coordinator Cindy Morrow talked with Plaintiff on the telephone and asked "Mr. Ohai, why don't you want to make your 2nd mortgage payments?", and tried to talk him into making a debit card payment on the debt.

Finally, Plaintiff claims Delta violated the discharge injunction by selling one or more of its loans. Plaintiff alleges Delta "decided the way around not being able to recoup the amount for the loans, was to sell the Notes to unsuspecting debt buyers." Delta allegedly first sold the Tradd HELOC in February 2012 (pre-petition) to Sussex Insurance Co. Then Plaintiff received a letter dated May 23, 2017 showing the Tradd HELOC had been sold to Park Tree Investments 20, LLC. The complaint is not clear about if, when, or how, the Tradd Mortgage Loan was sold.

Delta filed the Motion alleging the complaint fails to state a plausible claim for relief because suspending Plaintiff's services at Delta did not amount to an act to collect a debt from Plaintiff while the automatic stay was in place and Delta did not attempt to collect discharged debt.

II. **LAW**

    a. **Motion to Dismiss for Failure to State a Claim**

Delta seeks dismissal of the complaint pursuant to Federal Rule of Bankruptcy Procedure

5

12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

While the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," Iqbal, 556 U.S. at 678, the purpose of a motion to dismiss is not to resolve disputed facts or decide the merits of a case. Rather, the purpose of a motion to dismiss is to ensure that the plaintiff has provided notice of the grounds which entitle him to relief. Twombly, 550 U.S. at 561. The facts alleged must be taken as true, and dismissal is inappropriate merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. Official Comm. of Unsecured Creditors of Tousa, Inc. v. Technical Olympic, S.A. (In re Tousa), 437 B.R. 447, 452 (Bankr. S.D. Fla. 2010) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)).

    b. **Automatic Stay**

The Bankruptcy Code provides that a creditor must stay all proceedings against a debtor and its property after the debtor files a petition for bankruptcy. 11 U.S.C. § 362(a)(1). Section 362(a)(1) states that "a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of the commencement or continuation, including the issuance or employment of process, of a judicial . . . action or proceeding against the debtor . . . or to recover a claim against the debtor that arose before the commencement of the case under this title." Id. The automatic stay is one of

6

the most important provisions of the Bankruptcy Code and is designed to afford debtors "breathing space" to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" Grogan v. Garner, 498 U.S. 279, 286, 111 S. Ct. 654, 659, 112 L. Ed. 2d 755 (1991).

If a creditor willfully violates the automatic stay, the Bankruptcy Code establishes a mechanism both to provide compensation for the offense and to punish the offender. Section 362(k) of the Bankruptcy Code provides as follows:

> Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1).

A violation of the automatic stay is "willful" if the party (1) knew the automatic stay was invoked and (2) intended the actions which violated the stay. The fact that the party did not intend to violate the automatic stay and acted without malice does not preclude a finding of contempt and an assessment of appropriate sanctions. Id. A willful violation does not require a specific subjective intent to violate the stay. Rather, a willful violation may be found if the creditor knew of the automatic stay and its actions were intentional. When a creditor has actual knowledge that a debtor has filed a bankruptcy petition, the creditor has an affirmative duty to terminate or undo any action which violates the automatic stay.

    c. **Discharge Injunction**

Section 524 governs a debtor's discharge in bankruptcy. It provides that a bankruptcy discharge, among other things:

7

> operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

11 U.S.C. § 524(a)(2). "The discharge injunction is like a permanent extension of the automatic stay under 11 U.S.C. § 362(a) of the Bankruptcy Code and thus, includes all types of collection activity such as: letters, phone calls, threats of criminal proceedings or other adverse actions brought about with the purpose of debt repayment." In re McConnie Navarro, 563 B.R. 127, 141 (Bankr. D.P.R. 2017) (citation omitted).

Pursuant to section 105, a bankruptcy court may enforce the discharge injunction and "order damages if the circumstances so require." Id. Sanctions for violations of the discharge injunction are in the nature of civil contempt. Id. The Supreme Court has held that a bankruptcy court may "impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." Taggart v. Lorenzen, 139 S. Ct. 1795, 1801 (2019). In Taggart, the Supreme Court explained that means "there is no fair ground of doubt as to whether the [discharge] order barred the creditor's conduct." Id. at 1799. To meet this standard, the party that violated the discharge injunction must have acted with knowledge of it. In re Cowan, 2020 WL 7330049, at *6 (Bankr. N.D. Ga. Dec. 11, 2020) (citing In re Milani, 2020 WL 5551990, at *5 (Bankr. N.D. Ga. Sept. 16, 2020)). Further, to discern whether an act is one to collect a debt, courts consider whether the conduct objectively had the practical effect of improperly coercing payment of a discharged debt. In re Minech, 632 B.R. 274, 282 (Bankr. W.D. Pa. 2021); In re Roth, 935 F.3d 1270, 1278–79 (11th Cir. 2019) (emphasis in original) (the court must determine "whether the *objective* effect of [the act] . . . is to pressure a debtor to repay a discharged debt"). "In this regard, a subjective good faith belief that the action

8

taken does not violate the discharge injunction is not sufficient to avoid sanctions if such a belief is not objectively reasonable." Milani, 2020 WL 5551990, at *5.

The discharge injunction, however, has limits. A Chapter 7 discharge releases the debtor from all debts that arose before the petition date, but it only extinguishes "personal liability of the debtor." 11 U.S.C. §§ 727(b), 524(a)(2). The discharge does not affect a secured creditor's interest in real property, and a creditor's right to foreclose on a mortgage survives the bankruptcy. Johnson v. Home State Bank, 501 U.S. 78, 83 (1991); see also Farrey v. Sanderfoot, 500 U.S. 291, 297 (1991) ("[o]rdinarily, liens and other secured interests survive bankruptcy"); Bentley v. OneMain Fin. Grp. (In re Bentley), 2020 WL 3833069, at *6 (B.A.P. 6th Cir. July 8, 2020) ("The concept that a lien 'rides through' bankruptcy is axiomatic."). "[A]fter the automatic stay terminates as to the property, a secured creditor may take any appropriate action to enforce a valid lien surviving the discharge, as long as the creditor does not pursue in personam relief against the debtor." In re Best, 540 B.R. 1, 9 (B.A.P. 1st Cir. 2015) (citation omitted).

Section 524 does not bar all contact with a discharged debtor. Indeed, section 524(j) provides an exception to the discharge injunction for creditors who hold claims secured by the debtor's principal residence as long as the creditor's acts are in the ordinary course of business between the debtor and the creditor and limited to seeking payments in lieu of in rem relief (i.e. foreclosure). This section provides:

> Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if—
>> (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
>> (2) such act is in the ordinary course of business between the creditor and the debtor; and
>> (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

9

11 U.S.C. § 524(j). All three requirements must be met for the exception to apply. In re Lemieux, 520 B.R. 361, 368 (Bankr. D. Mass. 2014). "The law thus attempts to create a safe harbor for a mortgage servicer to continue to send advices of and payment books to the debtor even if the personal debt has been discharged." McConnie Navarro, 563 B.R. at 142 (citation omitted). The purpose of section 524(j) is to permit certain post-discharge actions of a secured creditor when the debtor remains in his or her home. See In re Whitaker, 2013 WL 2467932, at *8-9 (Bankr. E.D. Tenn. June 7, 2013); In re Steinberg, 447 B.R. 355, 359 (Bankr. S.D. Fla. 2011). As one court explained, the exception in section 524(j) "makes sense" because it "would allow a secured creditor to remain in contact with a debtor who was living in the real property as his principal residence, send communications in the regular course of business, and explore the possibility of the debtor retaining his principal residence—i.e., collecting payments in lieu of foreclosure." Bibolotti v. American Home Mortgage Servicing, Inc., 2013 WL 2147949, *9 (E.D. Tex. May 15, 2013).

The distinction between communications that improperly seek to impose personal liability on a debtor and those that merely seek periodic payments in lieu of foreclosure is dependent, to a great extent, on the content of the correspondence. In re Cantrell, 605 B.R. 841, 856 (Bankr. W.D. Mich. 2019). The court must determine "whether the *objective* effect of [a communication] is to pressure a debtor to repay a discharged debt". Roth, 935 F.3d at 1278–79 (emphasis in original). "[T]he line between forceful negotiation and improper coercion is not always clear." McConnie Navarro, 563 B.R. at 143 (citation omitted). "An action is considered coercive when it is 'tantamount to a threat' . . . or places the debtor 'between a rock and a hard place.'" Id. "[C]ourts consider the 'immediateness' of the threatened action and the context in which this action took place." Id.

10

"Although not entirely dispositive, inclusion of 'clear and prominent disclaimers" informing discharged debtors that the creditor is 'solely seeking payment as a substitute for pursuing [its] in rem rights' is an effective way for the creditor to identify the purposes of the communications and to ensure that violation of the discharge injunction does not occur." Cantrell, 605 B.R. at 856; see also Best, 540 B.R. at 11 (existence of disclaimer language, however, will not insulate an otherwise improper demand for payment). Accordingly, the existence of disclaimer language in post-discharge communications with debtors is often a significant factor in determining whether the communications violate the discharge injunction. Thomas v. Seterus Inc. (In re Thomas), 554 B.R. 512, 520-21 (Bankr. M.D. Ala. 2016). The inclusion of an "amount due," "due date," and statements about an escrow balance does not diminish the effect of a prominent, clear, and broadly worded disclaimer. Roth, 935 F.3d at 1276.

Additionally, informational responses to inquiries from a debtor that do not make a demand for payment do not violate the discharge injunction. In re Mele, 486 B.R. 546, 557 (Bankr. N.D. Ga. 2013). In Cantrell, 605 B.R. 841, for example, the debtor received several letters sent in response to inquiries he had made and contact he had initiated. All but one of the letters included disclaimer language noting the bankruptcy and the discharge of the debtor's personal liability on the debt. The court concluded that, even in the absence of disclaimer language, the communications could not be construed as seeking to collect the mortgage debt as a personal liability of the debtor. Id. at 857.

### III. Application to Allegations

#### a. Automatic Stay

Plaintiff contends Delta violated the automatic stay by 1) sending him a letter dated September 14, 2012, 2) by informing credit reporting agencies Plaintiff owed a delinquent debt

11

and making derogatory reports to the agencies, and 3) communicating directly with Plaintiff.

Plaintiff asserts Delta violated the automatic stay by sending the letter suspending services, and closing his account. The September 14, 2012 letter stated, "It is [Delta's] policy to suspend services to any member when a loss *exists* on their account. Suspension of service may include, but is not limited to, closing checking accounts . . . . We are suspending your services due to Loan Loss due to Bankruptcy. Your checking account will be closed on October 1, 2012." (Doc. No. 1 ex. H.) A letter by a credit union notifying the debtor that the credit union is terminating services to a debtor does not violate of the automatic stay. See In re Callender, 99 B.R. 378, 379–80 (Bankr. S.D. Ohio 1989) (holding a similarly worded letter by a credit union did not violate section 362(a)(6)); see also Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 21 (1995) (holding administrative freeze on an account does not violate the automatic stay). Delta's letter appears informational. It does not request payment of debt, and is not threatening in tone. The letter merely indicates Delta was closing the Plaintiff's checking account, which does not in and of itself violate the automatic stay.

Next, Plaintiff states Delta violated the automatic stay by making a report to credit agencies. Reporting a debt to a credit reporting agency in and of itself is not a violation of the automatic stay. In re Henriquez, 536 B.R. 341, 348 (Bankr. N.D. Ga. 2015). "[C]redit reporting is an unusually agnostic function. Its primary purpose is to share information relevant to making credit decisions, not modify the behavior of a debtor. In fact, credit reports are not even communicated to their subjects directly." Minech, 632 B.R. at 282. Further, credit reporting is *generally* permitted notwithstanding a bankruptcy filing. Id.; Mortimer v. JP Morgan Chase Bank, Nat. Ass'n, 2012 WL 3155563, at *3 (N.D. Cal. Aug. 2, 2012) ("While it might be good policy in light of the goals of bankruptcy protection to bar reporting of late payments while a bankruptcy

12

petition is pending, neither the bankruptcy code nor the [FCRA] does so."). Credit reporting may, however, violate the automatic stay where there is evidence of additional collection activity. See e.g., In re Goodfellow, 298 B.R. 358, 362 (Bankr. N.D. Iowa 2003) (finding a violation of the automatic stay based on reporting of the debtor's debt as "past due" in addition to its collection letters and threatening phone calls to debtor attempting to collect the debt). Moreover, Plaintiff does not allege Delta's report was inaccurate or that, to the extent any information provided was false, it was given in an attempt to coerce Plaintiff into making payments during the pending bankruptcy case. Accordingly, the complaint fails to state a plausible claim Delta's credit reporting constituted a violation of the automatic stay.

  Plaintiff also contends Delta violated the automatic stay by communicating directly with him during the pendency of his bankruptcy case. Plaintiff does not state the manner in which Delta did so, but he may be referring to the September 14, 2012 letter discussed above. "[N]ot all communications from a creditor to a debtor are prohibited by § 362(a)." In re GYPC, INC., 634 B.R. 983, 1000 (Bankr. S.D. Ohio 2021); Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 423 (6th Cir. 2000) ("Something more than mere contact must be alleged in order to state a claim under § 362."). The September 14 communication does not violate the stay. The complaint does not describe any other post-petition, pre-discharge, communications. In order to survive a Rule 12(b)(6) motion to dismiss, the complaint must provide Delta with notice of a cognizable claim asserted against it for violating the automatic stay, i.e. it must allege, with specificity, an act to collect occurred while the automatic stay was in place. See In re Williams, 612 B.R. 682 (Bankr. M.D.N.C. 2020). The complaint does not. The complaint fails to state a plausible claim that Delta's communications with Plaintiff during the course of his bankruptcy case violated the automatic stay. For these reasons, the Court finds the complaint fails to state a plausible claim for relief that

13

Delta violated the automatic stay.

### b. Discharge Injunction

Plaintiff also claims Delta violated the discharge injunction by 1) selling either or both of its loans, 2) its employee asking him to make a payment on the discharged debt, and 3) continuing to try to collect discharged debt.

First, Plaintiff argues Delta violated the discharge injunction by selling the underlying loans. Plaintiff alleges Delta "decided the way around not being able to recoup the amount for the loans, was to sell the Notes to unsuspecting debt buyers." Delta allegedly first sold the Tradd HELOC in February 2012 (pre-petition) to Sussex Insurance Co. Then Plaintiff received a letter dated May 23, 2017 showing the Tradd HELOC had been sold to Park Tree Investments 20, LLC. The complaint is not clear about if, when, or how, the Tradd Mortgage Loan was sold.

The mere sale to a third party of a discharged debt cannot be deemed a violation of the discharge injunction. In re McKay, 613 B.R. 648, 649 (Bankr. E.D. Mich. 2020); Finnie v. First Union Nat'l Bank, 275 B.R. 743, 745-46 (E.D. Va. 2002) ("While a creditor is prohibited from utilizing a collection agency to recover a discharged debt on its behalf, there is no prohibition on the creditor *selling* the discharged debt, presumably at a greatly discounted rate, to a third party."). Further, "[a]bsent an agency relationship between the seller of a discharged debt and the purchaser of that debt, . . . the seller of a discharged debt is not liable for the purchaser's subsequent attempt to collect on that debt." Finnie, 275 B.R. at 746 (footnote omitted). The complaint contains no plausible claim based on Delta selling one or both of Plaintiff's loans. Accordingly, Plaintiff's claim that Delta violated the discharge injunction by selling its loans is dismissed.

Next, Plaintiff alleges Delta's Loss Mitigation Coordinator, Cindy Morrow, asked Plaintiff, during a telephone call in 2019, "Mr. Ohai, why don't you want to make your 2nd mortgage

14

payments" and tried to talk him into making a debit card payment on the debt. Not all communications with a debtor post-discharge are prohibited, and section 524(j) expressly contemplates some communication between a creditor and the debtor after the entry of the discharge order. For example, in In re Giles, 502 B.R. 892, 903 (Bankr. N.D. Ga. 2013), the creditor called the debtor regarding late payments on a note secured by the debtor's principal residence. The court considered the timing and the purpose of the contacts and found the creditor's calls were limited to seeking the late payments on the note so that it would not be forced to foreclose, which it knew was its only remedy. Id. There was no evidence the communications were for the purpose of coercing the debtor into making a payment she did not want to make and, accordingly, the court found the calls did not violate the discharge injunction. Id.

The complaint does not include allegations regarding the circumstances surrounding the call in 2019. But, accepting as true the facts alleged that the Delta representative asked Plaintiff to pay on the discharged debt with a debit card, the complaint pleads sufficient factual content for the court to draw the reasonable inference that the comments during the 2019 phone call were made for the purpose of collecting a discharged debt. Accordingly, Plaintiff's claim that Delta violated the discharge injunction by asking him to make a payment during the 2019 phone call withstands dismissal.

Lastly, Plaintiff alleges that Delta tried to collect discharged debt. However, Plaintiff provides no details other than those related to the 2019 call and sale of the note(s). In order to survive a Rule 12(b)(6) motion to dismiss, the complaint must provide Delta with notice of a cognizable claim asserted against it for violation of the discharge injunction, i.e. it must allege, with specificity, an act to collect occurred. See Williams, 612 B.R. at 692; In re Motichko, 395 B.R. 25, 31 (Bankr. N.D. Ohio 2008). Plaintiff's generalized grievance does not include specific

15

factual content to survive Delta's Rule 12(b)(6) Motion to Dismiss.

## IV. CONCLUSION

**IT IS ORDERED** that the Motion is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's claim Delta violated the automatic stay is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff's claim Delta violated the discharge injunction by selling the underlying loans and generally tried to collect discharged debt is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff's claim Delta violated the discharge injunction by asking him to make a payment on the debt based on the 2019 call alleged **STANDS**.

END OF DOCUMENT

**Distribution List**

Emmanuel O Ohai
863 Flat Shoals Rd. SE
C #155
Conyers, GA 30094

Charles H. Van Horn
Berman Fink Van Horn, P.C.
3475 Piedmont Rd., NE
Suite 1100
Atlanta, GA 30305