

**IT IS ORDERED as set forth below:**

**Date: April 3, 2024**

_Wendy L. Hagenau_

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 12-65475-WLH |
| EMMANUEL OHAI,<br>　　　Debtor. | CHAPTER 7 |
| EMMANUEL OHAI,<br>　　　Plaintiff,<br><br>v.<br><br>DELTA COMMUNITY CREDIT UNION,<br>PNC BANK NATIONAL ASSOCIATION,<br>INC., DEAN ENGLE & PARK TREE<br>INVESTMENTS, LLC, PARK TREE<br>INVESTMENTS 20, LLC, FCI LENDER<br>SERVICES, INC., DANIEL I. SINGER &<br>SINGER LAW GROUP, PHILLIP L.<br>JAUREGUI D/B/A JAUREGUI & LINDSAY<br>LLC, MICHAEL W. LINDSEY D/B/A,<br>JAUREGUI & LINDSEY, LLC, MICROBILT<br>CORPORATION,<br><br>　　　Defendants. | ADVERSARY PROCEEDING<br>NO. 23-5041-WLH |

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AS TO PNC BANK, N.A. AND MOTION FOR JUDICIAL NOTICE AND SETTING DEADLINE FOR PRE-TRIAL ORDER

1

**THIS MATTER** is before the Court on cross Motions for Summary Judgment filed by Plaintiff (Doc. No. 136) and PNC Bank, N.A. ("PNC") (Doc. No. 161), and Plaintiff's Motion for Judicial Notice (Doc. No. 178). The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), and the claims of violating the discharge injunction are core proceedings under 28 U.S.C. § 157(b)(2)(A), (G), & (O). See In re Golden, 630 B.R. 896, 920 (Bankr. E.D.N.Y. 2021) (it is axiomatic that this Court has subject matter jurisdiction to consider such core matters); In re Johnson, 575 F.3d 1079, 1083 (10th Cir. 2009); In re Harlan, 402 B.R. 703, 710 (Bankr. W.D. Va. 2009).

## I.   SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, made applicable to contested matters by Federal Rules of Bankruptcy Procedure 7056 and 9014. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c) ; Fed. R. Bankr. P. 7056(c). "The substantive law [applicable to the case] will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden of proving there are no disputes as to any material facts. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The party moving for summary judgment has "the initial responsibility of informing the . . . court of [the] basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes

demonstrate the absence of a genuine issue of material fact." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (citing Celotex Corp., 477 U.S. at 323).

## II.    UNDISPUTED FACTS

On April 25, 2008, Plaintiff purchased an investment property at 3012 Stone Mountain Street, Lithonia, Georgia ("Lithonia Property"). RBC was the mortgage lender. Plaintiff fell behind on the payments, and RBC foreclosed on May 4, 2010. RBC was the highest bidder at the non-judicial foreclosure sale at $23,250. RBC filed a complaint in DeKalb County Superior Court on March 31, 2011 seeking to set aside the foreclosure due to the condition of the Lithonia Property. After Plaintiff's answer, RBC dismissed the complaint in May 2011. PNC succeeded to RBC's rights and obligations as a result of a merger announced in 2011 and completed in 2011 or 2012.

On June 20, 2012, Plaintiff and his now ex-wife filed a petition under Chapter 7 of the Bankruptcy Code. Plaintiff received a discharge on October 5, 2012 (Bankr. Doc. No. 14), and the bankruptcy case was closed.

After Plaintiff's bankruptcy discharge, he received numerous monthly statements from PNC. (Compl. Doc. No. 1 p. 216-229.) Plaintiff has identified eight such statements from September 24, 2018 through April 26, 2019. Each statement was addressed to Plaintiff, showed a total amount due of $22,087.61, and stated that amount needed to be paid to bring the account current. The statements included a "Bankruptcy Message" stating: "Our records show that either you are a debtor in bankruptcy or you discharged personal liability for your account in bankruptcy. We are sending this statement to you for informational and compliance purposes only. It is not an attempt to collect a debt against you."  The second page of the statements showed $0 due, but at least two of the statements contained the following statements:

> Your loan was accelerated on May 24, 2010, and the entire outstanding balance is now due and payable.  The Accelerated Amount was the amount due as of the

acceleration date. The Accelerated Amount continues to incur interest and applicable fees and expenses after the acceleration date. You loan has been charged off and no additional fees or interest will be charged to your loan. Periodic statements for each billing cycle will no longer be provided. This does not release you from your obligation to pay off your loan. The lien on the property remains in place and you are still liable for the loan obligation and any obligations arising from or related to the property, which may include property taxes. You may be required to pay the balance on the account in the future, for example, upon sale of the property. The balance on the account is not being canceled or forgiven. . . .

Additionally, PNC sent to Plaintiff communications stating, "Assistance options may be available!" and suggesting that Plaintiff could pay the debt by refinancing the loan, modifying the loan, or obtaining a forbearance, among other options. (Compl. Doc. No. 1 p. 206-215.)  Plaintiff has identified five such communications from August 22, 2018 through July 20, 2020.  Each communication states,

As an alternative to foreclosure, you may be able to sell your home and use the proceeds to pay off your current loan. . . .We are sending this notice to you because you are behind on your payment. We want to notify you of possible ways to avoid losing your home. We have a right to invoke foreclosure based on the terms of your contract; however, if you are protected by an automatic stay in bankruptcy, the right to enforce our lien would be subject to bankruptcy court approval. . . .

(Referred to herein as "Default Communications.")

Plaintiff sent PNC a cease-and-desist letter on September 5, 2018. PNC responded on September 10, 2018, indicating it received Plaintiff's correspondence and was "currently reviewing" the inquiry. PNC then responded to Plaintiff by letter dated September 19, 2018. The letter indicated PNC received Plaintiff's request for a validation of debt but stated, "[t]he request for a validation of debt is untimely as PNC Bank has charged off your loan as of November 29, 2010." The letter went on to say, "PNC Bank's lien against your Property will remain and you remain obligated to pay PNC Bank the full outstanding balance of your account. If you wish to make a payment or obtain a payoff quote, please contact us . . . ."

4

Plaintiff received a Form 1099 C from PNC in 2021.  It states an identifiable event occurred on February 26, 2021, resulting in discharge of debt in the amount of $19,880.10.  The box was checked saying the Plaintiff was personally liable for repayment of the debt, showed an event code of "D" and that the fair market value of the property at issue was $116,000.  The event code "D" is defined as foreclosure election.

PNC filed a Motion to Dismiss (Doc. No. 12) for lack of subject matter jurisdiction, which the Court denied (Doc. No. 34). All claims against PNC remain outstanding.

On January 31, 2024, Plaintiff filed a Motion for Summary Judgment against PNC (Doc. Nos. 136-138, 123) ("Plaintiff's Motion"). On February 28, 2024, PNC filed a Cross Motion for Summary Judgment (Doc. Nos. 161, 162, 164) ("PNC's Motion"). Each party responded to the motions for summary judgment (Doc. Nos. 162, 163, 185), and Plaintiff replied to PNC's response (Doc. No. 181).

Plaintiff filed a Motion for Judicial Notice on March 11, 2024 (Doc. No. 178).

### III.    <u>JUDICIAL NOTICE</u>

In Plaintiff's Motion for Judicial Notice, Plaintiff asks the Court to take judicial notice of a court pleading in another matter. Plaintiff filed a complaint in the United States District Court for the Northern District of Georgia, <u>Ohai v. Delta Community Credit Union et al</u>, Civil Action No. 1:20-cv-02220-SCJ-JEM against PNC and others. PNC filed a Motion to Dismiss (District Court Doc. No. 13) on June 22, 2020. Plaintiff asks the Court to take judicial notice of the filing for the fact that the PNC and RBC merger occurred in 2011. PNC filed a response in opposition to the request (Doc. No. 186) and Plaintiff replied (Doc. No. 187).

Under Federal Rule of Evidence 201, made applicable in bankruptcy proceedings by Fed. R. Bankr. P. 9017, a court may take judicial notice of "matters of public record." <u>See</u> Fed. R. Evid.

201. A court may take notice of certain documents that are "public records," "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned." Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010) (citing Fed. R. Evid. 201(b)); see also Universal Express, Inc. v. U.S. S.E.C., 177 F. App'x 52, 53 (11th Cir. 2006) (per curiam) (citing Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 700 (8th Cir. 2003)). Judicial notice can be taken at any stage of a case. Fed. R. Evid. 201(d); Rauso v. Fein, 2022 WL 17833271, at *2 n.3 (E.D. Pa. Dec. 21, 2022). The Eleventh Circuit cautions, however, that taking judicial notice is a highly limited process. See Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997); Kaplan v. Regions Bank, 2019 WL 4668175, at *12 (M.D. Fla. Sept. 25, 2019); Ballard v. Bank of Am. Corp., 2014 WL 11970543 , at *7 (N.D. Ga. Sept. 11, 2014).

Courts may take judicial notice of recorded documents from other proceedings, but a court may take judicial notice of filings in other courts only to establish the fact of the filing—not for the truth of its contents. Kaplan, 2019 WL 4668175, at *12. Thus, "a court may take judicial notice of the undisputed matters of public record, i.e., the fact that hearings and prior proceedings took place, and what was said in those proceedings, but it may not take judicial notice of disputed facts stated in public records for their truth." Callier v. Outokumpu Stainless USA, LLC, 2022 WL 885037, at *3 (S.D. Ala. Mar. 24, 2022); see also F.D.I.C. v. O' Flahaven, 857 F. Supp. 154, 157 (D.N.H. 1994). While a court may take judicial notice of the fact a motion was filed in another court, it may not rely on the truth of the matters stated therein. Kerruish v. Essex Holdings, Inc., 777 F. App'x 285, 293-94 (11th Cir. 2019) (citing Coney v. Smith, 738 F.2d 1199, 1199-200 (11th Cir. 1984)).

Plaintiff asks the Court to consider PNC's motion to dismiss filed in litigation in the District Court. The fact PNC filed a motion to dismiss is not subject to dispute. (Nor is it relevant to the

pending Motion.) But Plaintiff asks the Court to not only take judicial notice of the filing of the motion, but also for the truth of the matters asserted therein, more specifically, for the date PNC merged with RBC. This is improper under the Federal Rules of Evidence. Moreover, as discussed below, the date of the merger is not relevant to the Court's decision herein. Accordingly, the Court declines to take judicial notice of the statements made in PNC's District Court motion to dismiss.

### IV.    <u>ANALYSIS</u>

#### a.    <u>Automatic Stay</u>

The Bankruptcy Code provides that a creditor must stay all proceedings against a debtor and its property after the debtor files a petition for bankruptcy. 11 U.S.C. § 362(a)(1). Section 362(a)(1) states that "a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of the commencement or continuation, including the issuance or employment of process, of a judicial . . . action or proceeding against the debtor . . . or to recover a claim against the debtor that arose before the commencement of the case under this title." <u>Id.</u> The automatic stay is one of the most important provisions of the Bankruptcy Code and is designed to afford debtors "breathing space" to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" <u>Grogan v. Garner</u>, 498 U.S. 279, 286, 111 S. Ct. 654, 659, 112 L. Ed. 2d 755 (1991).

If a creditor willfully violates the automatic stay, the Bankruptcy Code establishes a mechanism both to provide compensation for the offense and to punish the offender. Section 362(k) of the Bankruptcy Code provides as follows:

> Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1).

A violation of the automatic stay is "willful" if the party (1) knew the automatic stay was invoked and (2) intended the actions which violated the stay. The fact that the party did not intend to violate the automatic stay and acted without malice does not preclude a finding of contempt and an assessment of appropriate sanctions. Id. A willful violation does not require a specific subjective intent to violate the stay. Rather, a willful violation may be found if the creditor knew of the automatic stay and its actions were intentional. When a creditor has actual knowledge that a debtor has filed a bankruptcy petition, the creditor has an affirmative duty to terminate or undo any action which violates the automatic stay.

### b. Discharge Injunction

Section 524 governs a debtor's discharge in bankruptcy. It provides that a bankruptcy discharge, among other things:

> operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

11 U.S.C. § 524(a)(2). "The discharge injunction is like a permanent extension of the automatic stay under 11 U.S.C. § 362(a) of the Bankruptcy Code and thus, includes all types of collection activity such as: letters, phone calls, threats of criminal proceedings or other adverse actions brought about with the purpose of debt repayment." In re McConnie Navarro, 563 B.R. 127, 141 (Bankr. D.P.R. 2017) (citation omitted).

Pursuant to section 105, a bankruptcy court may enforce the discharge injunction and "order damages if the circumstances so require." Id. Sanctions for violations of the discharge injunction are in the nature of civil contempt. Id. "Sanctions … may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate

the complainant for losses sustained." In re McLean, 794 F.3d 1313, 1323 (11th Cir. 2015) (citing

F.T.C. v. Leshin, 719 F.3d 1227, 1231 (11th Cir. 2013)). Imposing sanctions for a discharge

violation requires two separate inquiries: the first is whether the discharge order was violated. The

discharge order is violated if the defendant's actions objectively pressure a debtor to pay a

discharged debt. See In re Minech, 632 B.R. 274, 282 (Bankr. W.D. Pa. 2021); In re Roth, 935

F.3d 1270, 1278–79 (11th Cir. 2019). If the discharge order is violated, then the defendant can be

in contempt if the party had "knowledge" of the discharge order and there was no fair ground of

doubt that the actions taken would violate it. Taggart v. Lorenzen, 139 S. Ct. 1795, 1801 (2019).

"In this regard, a subjective good faith belief that the action taken does not violate the discharge

injunction is not sufficient to avoid sanctions if such a belief is not objectively reasonable." Milani,

2020 WL 5551990, at *5. Simply being aware of the discharge order, however, and intending the

actions that violated the order are not sufficient to constitute knowledge. Taggart v. Lorenzen, 139

S. Ct. 1795, 1801 (2019).

The discharge injunction, however, has limits. A Chapter 7 discharge releases the debtor

from all debts that arose before the petition date, but it only extinguishes "personal liability of the

debtor." 11 U.S.C. §§ 727(b), 524(a)(2). The discharge does not affect a secured creditor's interest

in real property, and a creditor's right to foreclose on a mortgage survives the bankruptcy. Johnson

v. Home State Bank, 501 U.S. 78, 83 (1991); see also Farrey v. Sanderfoot, 500 U.S. 291, 297

(1991) ("[o]rdinarily, liens and other secured interests survive bankruptcy"); Bentley v. OneMain

Fin. Grp. (In re Bentley), 2020 WL 3833069, at *6 (B.A.P. 6th Cir. July 8, 2020) ("The concept

that a lien 'rides through' bankruptcy is axiomatic."). "[A]fter the automatic stay terminates as to

the property, a secured creditor may take any appropriate action to enforce a valid lien surviving

9

the discharge, as long as the creditor does not pursue in personam relief against the debtor." <u>In re</u>

<u>Best</u>, 540 B.R. 1, 9 (B.A.P. 1st Cir. 2015) (citation omitted).

Section 524 does not bar all contact with a discharged debtor. Indeed, section 524(j)

provides an exception to the discharge injunction for creditors who hold claims secured by the

debtor's principal residence as long as the creditor's acts are in the ordinary course of business

between the debtor and the creditor and limited to seeking payments in lieu of in rem relief (i.e.

foreclosure). This section provides:

> Subsection (a)(2) does not operate as an injunction against an act by a creditor that
> is the holder of a secured claim, if—
>> (1) such creditor retains a security interest in real property that is the
>> principal residence of the debtor;
>> (2) such act is in the ordinary course of business between the creditor
>> and the debtor; and
>> (3) such act is limited to seeking or obtaining periodic payments
>> associated with a valid security interest in lieu of pursuit of in rem
>> relief to enforce the lien.

11 U.S.C. § 524(j). All three requirements must be met for the exception to apply. <u>In re Lemieux</u>,

520 B.R. 361, 368 (Bankr. D. Mass. 2014). "The law thus attempts to create a safe harbor for a

mortgage servicer to continue to send advices of and payment books to the debtor (under certain

circumstances) even if the personal debt has been discharged." <u>McConnie Navarro</u>, 563 B.R. at

142 (citation omitted). The purpose of section 524(j) is to permit certain post-discharge actions of

a secured creditor when the debtor remains in his or her home. <u>See</u> <u>In re Whitaker</u>, 2013 WL

2467932, at *8-9 (Bankr. E.D. Tenn. June 7, 2013); <u>In re Steinberg</u>, 447 B.R. 355, 359 (Bankr.

S.D. Fla. 2011). As one court explained, the exception in section 524(j) "makes sense" because it

"would allow a secured creditor to remain in contact with a debtor who was living in the real

property as his principal residence, send communications in the regular course of business, and

explore the possibility of the debtor retaining his principal residence—i.e., collecting payments in

lieu of foreclosure." <u>Bibolotti v. American Home Mortgage Servicing, Inc.</u>, 2013 WL 2147949, *9 (E.D. Tex. May 15, 2013).

The distinction between communications that improperly seek to impose personal liability on a debtor and those that merely seek periodic payments in lieu of foreclosure is dependent, to a great extent, on the content of the correspondence. <u>In re Cantrell</u>, 605 B.R. 841, 856 (Bankr. W.D. Mich. 2019). The court must determine "whether the *objective* effect of [a communication] is to pressure a debtor to repay a discharged debt". <u>Roth</u>, 935 F.3d at 1278–79 (emphasis in original). "[T]he line between forceful negotiation and improper coercion is not always clear." <u>McConnie Navarro</u>, 563 B.R. at 143 (citation omitted). "An action is considered coercive when it is 'tantamount to a threat' . . . or places the debtor 'between a rock and a hard place.'" <u>Id.</u> "[C]ourts consider the 'immediateness' of the threatened action and the context in which this action took place." <u>Id.</u>

"Although not entirely dispositive, inclusion of 'clear and prominent disclaimers' informing discharged debtors that the creditor is 'solely seeking payment as a substitute for pursuing [its] in rem rights' is an effective way for the creditor to identify the purposes of the communications and to ensure that violation of the discharge injunction does not occur." <u>Cantrell</u>, 605 B.R. at 856; <u>see also</u> <u>Best</u>, 540 B.R. at 11 (existence of disclaimer language, however, will not insulate an otherwise improper demand for payment). Accordingly, the existence of disclaimer language in post-discharge communications with debtors is often a significant factor in determining whether the communications violate the discharge injunction. <u>Thomas v. Seterus Inc. (In re Thomas)</u>, 554 B.R. 512, 520-21 (Bankr. M.D. Ala. 2016). Additionally, informational responses to inquiries from a debtor that do not make a demand for payment do not violate the

discharge injunction. In re Mele, 486 B.R. 546, 557 (Bankr. N.D. Ga. 2013); see also Cantrell, 605 B.R. 841, 857.

V.    **Application to Allegations**

a.    **Automatic Stay**

Plaintiff alleges PNC violated the automatic stay because its predecessor filed an action in the DeKalb County courts to rescind the foreclosure sale of the Lithonia Property.

PNC's predecessor, RBC, foreclosed on May 4, 2010. RBC filed a complaint in DeKalb County Superior Court on March 31, 2011 seeking to set aside the foreclosure due to the condition of the Lithonia Property. RBC dismissed the complaint in May 2011. Plaintiff filed his Chapter 7 bankruptcy case on June 20, 2012.

Filing the rescission action did not violate the automatic stay because there was no automatic stay in place—RBC filed and dismissed the rescission action more than a year before Plaintiff filed for bankruptcy relief. Plaintiff has not identified any other activity that occurred while the automatic stay was in place during the pendency of his bankruptcy case. Accordingly, there is no genuine issue of material fact that PNC did not violate the automatic stay, and summary judgment is appropriate as to PNC on Plaintiff's automatic stay violation claim.

b.    **Discharge Injunction**

Plaintiff also claims PNC violated the discharge injunction by attempting to collect on the foreclosed and discharged debt by: 1) providing him a Form 1099-C tax document in 2021; 2) sending him Default Communications and monthly mortgage statements including an amount due and statements of continuing liability; 3) sending him a letter on September 19, 2018 stating PNC retained a lien and the full loan balance was due.

### i. **Form 1099-C**

Plaintiff alleges PNC violated the discharge injunction by issuing a Form 1099-C tax document to the Internal Revenue Service in 2021. He equates the filing of the Form 1009-C with the IRS and its delivery to him as an attempt by PNC to force him to pay the discharged debt. PNC states that it issued the Form 1099-C to comply with tax requirements. PNC contends, in early 2021, it learned that RBC had sold the Lithonia Property back in July 2011 and that it issued the Form 1099-C to advise the IRS about the earlier cancellation of debt.

A Form 1099-C is an IRS reporting requirement. In re Lambert, 655 B.R. 841, 846 (Bankr. N.D. Ga. 2023). An entity that "discharges" indebtedness of $600 or more must file an informational return with the Internal Revenue Service. In re Lambert, 655 B.R. 841, 844 (Bankr. N.D. Ga. 2023) (citing 26 U.S.C. § 6050P). The "informational return" is colloquially known as "Form 1099-C." Id. The IRS Regulations specifically identify seven categories of "identifiable events" that trigger the requirement for a creditor to file Form 1099-C. 26 C.F.R. § 1.6050P–1(b). The Form 1099-C must identify the amount of the debt, the person whose debt was discharged, and the date the debt was discharged. 26 U.S.C. § 6050P. The entity making the reporting must furnish a copy to the person whose debt was discharged. 26 U.S.C. § 6050P(d). Filing a Form 1099-C is meant to provide information to the IRS to determine whether the debtor properly accounted for the discharge of indebtedness.[1] "IRS Regulations permit issuance of a Form 1099-C based on a discharge of the debt in a bankruptcy case." Id. (citing 26 C.F.R. § 1.6050P–1(b)).

Courts have overwhelmingly held that the mere issuance of a Form 1099-C is an administrative or reporting requirement that does not carry substantive legal significance. Lambert,

---

[1] Debt canceled in a Title 11 bankruptcy case is not considered taxable income. 26 U.S.C. § 108. This is true even if the debtor receives a Form 1099-C from a lender showing the amount of the debt canceled or discharged. If a debtor receives an IRS 1099(c) on a debt discharged in a bankruptcy case, he can file Form 982 to tell the IRS that the sum on the 1099 should be excluded from his income by reason of his bankruptcy.

655 B.R. at 845 (citing F.D.I.C. v. Cashion, 720 F.3d 169, 179 (4th Cir. 2013) ("the filing [of] a Form 1099-C is a creditor's required means of satisfying a reporting obligation to the IRS"); Owens v. Comm'r, 67 Fed. Appx 253 (5th Cir. 2003); Ware v. Bank of America Corp., 9 F.Supp.3d 1329 (N.D. Ga. 2014); In re Zilka, 407 B.R. 684 (Bankr. W.D. Pa. 2009). Filing a "Form 1099-C is a reporting requirement imposed by IRS regulations; the Form itself has no substantive effect[.]" Id. at 845. Case law is clear: the issuance of the Form 1099-C is not a violation of the discharge injunction. In re Jackson, 2022 WL 4587359, at *4 (Bankr. W.D. Ky. Sept. 29, 2022); In re Bates, 2014 WL 1870831 (Bankr. D.N.H. May 8, 2014).

PNC issued the Form 1099-C as an administrative reporting requirement. Nothing in the form constitutes a threat to Plaintiff by PNC or sets forth directly or indirectly any adverse alternatives that could be avoided by payment of a discharged debt. See Bates, 2014 WL 1870831, at *5. The mere issuance of a Form 1099-C does not violate the discharge injunction, Jackson, 2022 WL 4587359, at *4, and the summary judgment record does not support any factual or legal basis to find a violation of the discharge injunction.

The Court notes, however, that the Form 1099-C was incorrect. PNC states it issued the Form 1099-C in 2021 to inform the IRS about the charge-off of the underlying loan, which occurred nearly a decade before. The Form 1099-C gave a charge off date in 2021, though the foreclosure happened in 2010 and Plaintiff received a bankruptcy discharge in 2012. The Form 1099-C also listed the value of the Lithonia Property as $116,000, which was clearly not the value of the Lithonia Property in 2010, because the foreclosure bid was $23,520 and, afterward, RBC sought to rescind the sale due to the condition of the property. Moreover, the Form 1099-C incorrectly states Plaintiff had personal liability when the debt was charged off and used the code "D" for foreclosure, rather than "A" for bankruptcy. Thus, the Form 1099-C is not accurate, and

14

some other action to address the discrepancies may be appropriate in another forum. But that is

not before the Court. The motions before the Court request summary judgment as to whether the

issuance of the Form 1099-C was a discharge violation. It was not. Accordingly, summary

judgment is warranted in favor of PNC.

### ii. **Monthly Statements and Default Communications**

PNC sent Plaintiff loan account statements and regular Default Communications during

2018-2020, years after foreclosure and discharge (Compl. P. 206-29). Each account statement

included a total payment amount due. A second page is included with several statements stating,

> Your loan was accelerated on May 24, 2010, and the entire outstanding balance is
> now due and payable. . . . Your loan has been charged off and no additional fees or
> interest will be charged to your loan. Periodic statements for each billing cycle will
> no longer be provided. This does not release you from your obligation to pay off
> your lien. The lien on the property remains in place and you are still liable for the
> loan obligation and any obligations arising from or related to the property. . . The
> balance on the account is not being canceled or forgiven[.]

PNC contends that the statements were informational, showed that there was no

outstanding balance owed, and included a bankruptcy disclaimer. PNC acknowledges that it did

not retain a security interest in the Lithonia Property when the statements were sent, but it contends

that the communications were sent due to a mistake, more particularly that PNC's records,

transmitted by RBC, incorrectly showed that PNC still had a security interest in the property.

Mortgage loan servicing is generally permitted post-discharge under section 524(j), and a

creditor may send potentially helpful informational statements to a discharged debtor who resides

in the property, particularly when coupled with a bankruptcy disclaimer. See Roth, 935 F.3d at

1273, 1276; see also McConnie Navarro, 563 B.R. at 145. But section 524(j) permits post-

discharge contact with a debtor only where all three of the requirements set out in the section are

met. The first requirement is that the creditor retain a security interest in the real property that is

the principal residence of the debtor. The undisputed facts are that PNC held <u>NO</u> security interest in the Lithonia Property, and the Lithonia Property was not Plaintiff's principal residence. Section 524(j) provides no shelter to PNC.

The courts are firm that communications sent after a debtor has been discharged of any personal liability and after the mortgaged property has been foreclosed violate the discharge injunction. In <u>Collins v. Wealthbridge Mortgage Corp., (In re Collins)</u>, 474 B.R. 317 (Bankr. D. Maine 2012), for example, the creditor sent the debtor letters post-foreclosure and post-discharge about the debt. The court noted the creditor could "point to no language in the Code that permits a party that has no contractual or *in rem* relationship to a discharged debtor to send letters asserting such a relationship." <u>Id.</u> at 321. Furthermore, while the presence of disclaimer language has operated to mitigate a finding of harassment or coercion in other cases, it did not do so where the creditor "had no reason whatsoever to send these letters" to the debtors. <u>In re Kellogg</u>, 601 B.R. 537 (Bankr. D. Colo. 2019).

It is undisputed that PNC continued to send account statements years after the foreclosure and bankruptcy discharge. The complaint attaches eight of these statements from September 24, 2018 through April 26, 2019. PNC sent Plaintiff loans statements entitled "Home Equity Installment Loan Account Statement." The statements included a payment amount of $22,087.61 and an account history. Each stated: "Total: $22,087.61 unpaid amount that, if paid, would bring your account current." The statement also included a disclaimer labeled, "Bankruptcy Message" that stated: "Our records show that either you are a debtor in bankruptcy or you discharged personal liability for your account in bankruptcy. We are sending this statement to you for informational and compliance purposes only. It is not an attempt to collect a debt against you." Such a disclaimer is ineffective where, as here, the lender had no right to send <u>any</u> statements. Moreover, at least

several statements contained a message expressly stating PNC held a lien and Plaintiff remained liable on the debt.

PNC also sent Plaintiff several Default Communications regarding "Assistance options." (Compl. p. 206-215.) The notices are dated August 22, 2018 to as late as July 28, 2020. They all reference the Lithonia Property and state, "We are sending this notice to you because you are behind on your payment. We want to notify you of possible ways to avoid losing your home. We have a right to invoke foreclosure based on the terms of your contract; however, if you are protected by an automatic stay in bankruptcy, the right to enforce our lien would be subject to bankruptcy court approval. Please read this letter carefully." It is undisputed that the Lithonia Property was not Plaintiff's home and that he did not reside in it at the time the default notices were sent, as the Lithonia Property had already been foreclosed upon nearly a decade earlier. Nevertheless, the notices clearly state that Plaintiff was behind on the debt.

The account statements and Default Communications regarding Plaintiff's continuing liability for the debt violate the discharge injunction because they had the objective effect of pressuring Plaintiff to pay a debt.  At the time the communications were sent to Plaintiff, Plaintiff had no personal liability on the note, and PNC's predecessor had already obtained ownership of the Lithonia Property through foreclosure. The Bankruptcy Code prohibits a party like PNC that has no contractual or *in rem* relationship with a discharged debtor from sending the debtor letters based on a relationship that no longer exists. Accordingly, PNC's acts in sending Plaintiff the account statements and Default Communications violated the discharge injunction.

The next question is whether PNC's acts were in contempt. Having determined the discharge order was violated, a "court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's

conduct. In other words, civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful." Taggart, 139 S.Ct. at 1799. PNC contends that it issued the statement(s) because its records incorrectly showed that it had a security interest in the Property (i.e. it thought it retained a lien against the Lithonia Property because the information in its database was wrong).[2]

A party's subjective belief that it was complying with an order ordinarily will not insulate it from civil contempt if that belief was objectively unreasonable. Taggart, 139 S. Ct. at 1802. Subjective intent, however, may be relevant to determining an appropriate sanction. Id. In In re Craytor, 650 B.R. 470, 484 (Bankr. D.N.J. 2023), the court explained, "[a]s a general rule, ignorance of the law, or mistake as to the law, will not operate as an excuse from a charge of contempt, but it may be a mitigating circumstance, as in a case of honest mistake as to the controlling law." Id. (citing In re Paventy, 2022 WL 16545514, at *13 (B.A.P. 9th Cir. Oct. 28, 2022); 17 C.J.S. Contempt § 64). This is because the standard for contempt is an objective one. Therefore, a good faith mistake generally does not preclude contempt. Id. (citing Taggart, 139 S. Ct. at 1802; High Tech Nat'l, LLC v. Charles Stead, 2020 WL 5076796, at *3 (E.D. Pa. Aug. 27, 2020)).

Courts regularly reject creditors' arguments of mistakes, computer problems, and other showings of alleged good faith in assessing violations of the discharge injunction. Ibry v. F & S Auto Sales, LLC, 2015 WL 2232281, at *6 (M.D. Ala. May 12, 2015). For example, in In re Tucker, 526 B.R. 616 (Bankr. W.D. Va. 2015), an employee of the creditor mistakenly changed coding on debtor's account to allow collection notices to be sent, and the creditor erroneously

---

[2] Plaintiff makes much of the exact date on which the merger between PNC and RBC occurred. The date is not material to the Court's decision. In any event, PNC was the actor who sent the communications violating the stay. As stated herein, a mistake is not a defense to a potential contempt citation.

mailed the debtor a post-discharge mortgage statement advising her that her mortgage loan was seriously past due and demanding payment. The creditor immediately corrected the coding to prevent future notices from being sent. Though the statement was sent in error due to a clerical error, the creditor nevertheless intended to send the statement at the time in violation of the discharge injunction. See also Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.), 92 F.3d 1539, 1556 (11th Cir.1996) ("We are not persuaded by IRS's attempts to avoid responsibility for its conduct by blaming its computer system for not properly 'freezing' collection activities[.]"); C & W Asset Acquisition, LLC v. Feagins (In re Feagins), 439 B.R. 165, 176 (Bankr. D. Haw. 2010) (finding willful violation even though creditor had mistaken belief about the legal status of the discharged debt); Poole v. U.B. Vehicle Leasing, Inc. (In re Poole), 242 B.R. 104, 110 (Bankr. N.D. Ga. 1999) (finding conduct intentional even though creditor mistakenly failed to properly note the bankruptcy filing in its records); Vazquez v. Sears, Roebuck & Co. (In re Vazquez), 221 B.R. 222, 228 (Bankr. N.D. Ill. 1998) (rejecting contentions that the violation was merely a computer mistake and stating that creditor's size and complexity did not excuse its disregard of the discharge injunction).

Here, PNC sent Plaintiff loan account statements and Default Communications years after the loan was foreclosed and Plaintiff was discharged. The statements show Plaintiff owing over $20,000. Additionally, the messages clearly stated Plaintiff was not discharged of the debt and PNC continued to hold a lien on the property. These actions pressured Plaintiff to pay a debt for which he no longer had in rem or personal liability for the loan. There is no fair ground of doubt that sending Plaintiff loan statements in 2018 and 2019, and notices as late as July 2020, years after he was released from all liability for the loan, would violate the discharge injunction, even if they were sent as a result of a computer error. Accordingly, Plaintiff is entitled to summary judgment on his claim that PNC violated the discharge injunction and is in contempt of the

discharge order by sending loan account statements and Default Communications post-foreclosure and post-discharge. Whether this violation entitles Plaintiff to an award of damages is another matter.

### iii.  September 2018 Letter

Plaintiff alleges PNC violated the discharge injunction by sending him correspondence on September 19, 2018. Plaintiff initially contacted PNC with a cease-and-desist letter on September 5, 2018. PNC responded on September 10, 2018 indicating it received Plaintiff's correspondence and was "currently reviewing" the inquiry. PNC then responded to Plaintiff by letter dated September 19, 2018. The letter indicated PNC received Plaintiff's request for a validation of debt but, "The request for a validation of debt is untimely as PNC Bank has charged off your loan as of November 29, 2010." The letter went on to say, "PNC Bank's lien against your Property will remain and you remain obligated to pay PNC Bank the full outstanding balance of your account. If you wish to make a payment or obtain a payoff quote, please contact us . . . ."

Courts commonly find communications sent in response to a request for validation of debt are permissible. In Cantrell, for example, the court concluded that letters sent to the debtor in response to inquiries he had made, and contact he had initiated, could not be construed as seeking to collect the mortgage debt as a personal liability of the debtor. 605 B.R. at 857; see also In re Mele, 486 B.R. 546, 557 (Bankr. N.D. Ga. 2013); In re Henriquez, 536 B.R. 341, 345 (Bankr. N.D. Ga. 2015) (informational letters did not have the objective effect of pressuring the debtors to pay the discharged debt). Similarly, in In re Lett, 635 B.R. 713 (Bankr. N.D. Ga. 2022), the court found a "Validation of Debt Notice" that explained the sender's duties as servicing agent, provided a breakdown of the debt, and advised plaintiff of her rights to dispute the validity of the debt was informational in nature. But in each case, the lender held a lien on the debtor's residence so some

communication was authorized.

Here, Plaintiff sent PNC a cease-and-desist letter because the property had been foreclosed and Plaintiff had received a bankruptcy discharge. PNC responded to Plaintiff by stating, "PNC Bank's lien against your Property will remain and you remain obligated to pay PNC Bank the full outstanding balance of your account. If you wish to make a payment or obtain a payoff quote, please contact us . . . ."

The September 19, 2018 letter may have been sent in response to an inquiry from Plaintiff, but it incorrectly stated PNC retained a lien against the property and Plaintiff was obligated to pay PNC. Further, the letter was not sent in relation to routine mortgage servicing or foreclosure processing—there was no mortgage to service, as the loan had been foreclosed and Plaintiff discharged years earlier. Moreover, Plaintiff did not reside in the Lithonia Property. Considering all the contents of the communication and the context in which the communication was sent, the objective effect of the September 19, 2018 letter was to pressure Plaintiff to repay a foreclosed and discharged debt.

The Court concludes that there is no fair ground of doubt that PNC violated the discharge injunction by sending Plaintiff the September 19, 2018 letter. The communication clearly states Plaintiff owed money and gave an amount due. While a response to Plaintiff's letter may have been appropriate, the statement that PNC held a lien and Plaintiff remained obligated was wrong. There was no basis for sending such statement since, when it was sent, Plaintiff did not own the Lithonia Property, PNC did not retain a lien, and Plaintiff's personal liability had been discharged. Accordingly, there is no genuine issue of material fact that the September 19, 2018 letter objectively had the practical effect of improperly coercing payment of a discharged debt. Whether these violations entitle Plaintiff to an award of damages is discussed below.

c. **Damages**

Next, the Court must determine if summary judgment on Plaintiff's request for damages is appropriate. As stated above, contempt sanctions may be for the purpose of coercing the defendant to comply or to compensate the moving party for its losses, or both. McLean, 794 F. 3d at 1323. Under section 105, bankruptcy courts may impose compensatory sanctions for actual damages that a debtor incurs as a result of a creditor's violation of the discharge injunction. McLean, 794 F.3d at 1325. Actual damages are defined as "real, substantial and just damages or the amount awarded to a complainant in compensation for [her] actual and real loss or injury, as opposed to nominal damages and punitive damages." Roche, 361 B.R. at 624. (citing McMillian v. FDIC, 81 F.3d 1041, 1054 (11th Cir. 1996)). "Actual damages must be prove[n] with reasonable certainty, and mere speculation, guess or conjecture will not suffice." Castillo v. Three Aces Auto Sales, (In re Castillo), 456 B.R. 719, 725 (Bankr. N.D. Ga. 2011). Actual damages can include damages for emotional distress in some instances, McLean, 794 F. 3d at 1325, and nominal damages may be awarded. In re Burke, 258 B.R. 310, 314 (Bankr. S.D. Ga. 2001). Occasionally, punitive damages are justified. In re Covington, 2023 WL 3573751, at *4 (Bankr. N.D. Ill. May 19, 2023). But in all instances, the award requires evidence. If there is a question about the extent of damages, summary judgment is not appropriate. As the court explained in In re Burke, 258 B.R. 310, 316 (Bankr. S.D. Ga. 2001), a determination of the extent of damages or sanctions, if any, raises issues of material fact which remain in dispute and indicate the matter is not ripe for summary judgment.

Here, there is a genuine issue of material fact as to whether Plaintiff is entitled to damages and, if so, the proper measure of damages. Accordingly, summary judgment is denied as to damages.

## VI.    CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that summary judgment is **GRANTED** to PNC on Plaintiff's claim that PNC violated the automatic stay and Plaintiff's claim that PNC violated the discharge injunction by issuing a Form 1099-C tax statement.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** to Plaintiff on his claim that PNC violated the discharge injunction by sending him mortgage statements, Default Communications, and the September 19, 2018 letter. Such acts were acts of contempt.

**IT IS FURTHER ORDERED** that summary judgment is denied as to Plaintiff's request for sanctions and damages, and a trial on damages will be held.

**IT IS FURTHER ORDERED** that Plaintiff and PNC have thirty (30) days from the entry of this Order to submit a joint pre-trial order in accordance with Bankruptcy Local Rule 7016-2, which addresses the trial of Plaintiff's damages claim against PNC only.

**IT IS FURTHER ORDERED** that the Motion for Judicial Notice is **DENIED**.

**END OF DOCUMENT**

**Distribution List**

Emmanuel O Ohai
863 Flat Shoals Rd. SE
C #155
Conyers, GA 30094

William Lasker
Ballard Spahr
Utah One Center - Suite 800
201 S. Main St.
Salt Lake City, UT 84111-2221